**Electronically Filed
Intermediate Court of Appeals
29955
24-AUG-2011
08:50 AM**

NO. 29955

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
SHARON LOUISE SELWYN, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CR. NO. 07-1-0547)


MEMORANDUM OPINION
(By: Foley, Presiding Judge, Fujise and Leonard, JJ.)

Defendant-Appellant Sharon Louise Selwyn (**Selwyn**) appeals from the Judgment of Conviction and Probation Sentence entered by the Circuit Court of the Third Circuit (**Circuit Court**) on June 23, 2009.[1] Selwyn was charged by an indictment filed on November 8, 2007 with: (1) False Reporting to Law Enforcement Authorities, in violation of Hawaii Revised Statutes (**HRS**) § 710-1015(1) (1993); and (2) Perjury, in violation of HRS § 710-1060(1) (1993). The perjury count was dismissed without prejudice. After a jury trial, Selwyn was convicted of False Reporting to a Law Enforcement Authority.

I. BACKGROUND

This case arises out of Selwyn's December 19, 2005 report to Officer Ivan Tamura (**Tamura**) that, on November 2, 2005, Chad Sohriakoff (**Sohriakoff**) sexually assaulted her inside of her

---

[1] The Honorable Greg K. Nakamura presided.

apartment at Kamuela Senior Housing (**Kamuela Housing**) between
5:00-5:15 p.m.  At the time of the alleged assault Sohriakoff was
an employee of Hawaiʻi Affordable Properties (**HAP**), a company
owned by his parents.  As an employee of HAP, Sohriakoff was the
property manager of Kamuela Housing.  Sohriakoff testified that
while he had met with Selwyn at Kamuela Housing on that day, he
did not interact with Selwyn after 4:45 p.m., when he left the
complex, and that he did not assault her.

Selwyn moved into Kamuela Housing in January of 2005.
Although the apartment was brand new when she moved into it,
Selwyn testified that she soon began experiencing significant
problems with the unit, including a malfunctioning refrigerator,
a malfunctioning smoke alarm, and a roach infestation.  In
response to these problems, Selwyn claims she contacted Dan Cook
(**Cook**), an on-site resident manager, Sohriakoff, and Keith Kato
(**Kato**), the project director.

Selwyn testified that, on November 2, 2005, Sohriakoff
arrived early in the morning to help her with the problems
affecting her unit.  But, because she was not expecting him and
had already planned to run errands that day, they both agreed to
contact Selwyn's caseworker, Nidhi Chabora (**Chabora**), and
schedule a meeting with all parties present for a later time.

According to Selwyn, Sohriakoff returned to her
apartment later that day with a "big grin on his face saying,
'You know, I really wanna help you, I wanna help you, I wanna
make things better for you here.'"  Sohriakoff then pushed his
way into her apartment, locked the door behind him, and then
began "using foul language."  Selwyn claims he then started
grabbing her breast very hard and backed her up onto her bed.
Selwyn testified that she yelled at Sohriakoff to "get out" and
that "you cannot touch me like this."  Once on her bed,
Sohriakoff allegedly got on top of her, held her down by her

biceps, and began "slobbering" on her.  According to Selwyn's report to Tamura, the assault occurred between 5:00-5:15 p.m.

Selwyn testified that, after Sohriakoff left her apartment, she called Chabora and her two best girlfriends. Selwyn further claimed she called the police but nobody showed up.  Evidence also indicates that at 5:33 p.m., moments after the alleged assault, Selwyn sent an email to Kato and HAP.  In the email, Selwyn complained about Sohriakoff's persistent knocking on her door that day but did not mention Sohriakoff sexually assaulting her.

Selwyn testified that, on November 7, 2005, she again contacted the police.  Selwyn stateed that she expressed to dispatch that she had been sexually assaulted by her property manager and requested a female officer.  According to Selwyn, dispatch replied that no female officers were available but that all officers were trained to handle situations of sexual assault. On November 7, 2005, Officer John Gandolf (**Gandolf**) and Officer William Vickery (**Vickery**) were dispatched to Selwyn's residence.

Officers Gandolf and Vickery testified that, prior to arrival at Kamuela Housing on November 7, 2005, dispatch had not informed them of the nature of Selwyn's call.  Usually, when the nature of a call is as serious as a sexual assault, the dispatcher asks the reporting officers to contact dispatch before heading to the location of the call.  In the present case, the officers testified that dispatch did not include such instructions when they were told to report to Kamuela Housing. Furthermore, Gandolf testified that, when the officers arrived at Kamuela Housing and spoke with Selwyn, she did not mention anything about a sexual assault.  Instead, Selwyn complained about a neighbor of hers and an unrelated occurrence on November 3, 2005.  Officer Vickery testified that he did not know until after he was "all done" that the dispatcher had coded Selwyn's call as a "sexual assault."

Selwyn testified that on November 7, 2005, after contacting the police, Selwyn also called a rape crisis hotline. The hotline advised and aided Selwyn in seeking a temporary restraining order (**TRO**) against Sohriakoff.  In December of 2005, Selwyn was granted a TRO against Sohriakoff.  On March 1, 2006, Selwyn attended the first TRO hearing and testified that Sohriakoff had sexually assaulted her.  Prior to the second hearing, which was scheduled for March 29, 2006, Selwyn reportedly "received several serious death threats and . . . hang-up calls."  Consequently, claiming that she felt threatened, Selwyn failed to appear at the second TRO hearing and her case against Sohriakoff was dismissed.  Selwyn testified that she reported the death threats to the F.B.I. but could not recall the name of the agent she spoke with or whether she had complained to the F.B.I.'s internal affairs regarding how her complaint was handled.

After not hearing back from the police regarding her report to Officers Gandolf and Vickery, Selwyn claims she contacted the police to determine the status of her case. According to Selwyn, the police records department replied that they had not received her report and advised her to make a second report.  Then, on December 19, 2005, Selwyn spoke with Officer Tamura regarding the incident on November 2, 2005, and they filed a report.

Selwyn further testified that at some point she met with a prosecutor named Janet Garcia (**Garcia**) and discussed potentially prosecuting Sohriakoff.  Selwyn asserted that criminal charges were actually filed against Sohriakoff, but that she eventually withdrew her complaint because her health was

deteriorating and she feared the death threats she had received.[2/]

Sohriakoff testified that the events of November 2, 2005, occurred as follows. He arrived at Kamuela Housing at approximately 2:00 p.m. to "deal with some ongoing issues on the property." After speaking with the resident manager at the property, Sohriakoff went to Selwyn's apartment to discuss the issues with her unit. Sohriakoff claimed that Selwyn was unwilling to meet because of some errands she needed to run so they agreed to meet in Selwyn's apartment at 4:00 p.m. Sohriakoff did not enter Selwyn's apartment at this time. In the meantime, Sohriakoff spoke with other tenants of Kamuela Housing.

Sohriakoff further testified that, based on the conversations he had with the other tenants, an issue regarding the safety of the tenants required a follow-up with Selwyn before their 4:00 p.m. meeting time. Sohriakoff claims that after knocking on Selwyn's apartment door, Selwyn again told him that she did not want to speak with him so he left without entering into Selwyn's apartment.

Sometime afterwards, Sohriakoff testified that while conducting errands around Kamuela Housing he noticed three tenants arguing with Selwyn. According to Sohriakoff's testimony, Selwyn returned to her apartment as he approached the altercation. Sohriakoff claimed that after asking the other tenants to calm down, he followed Selwyn to her apartment to discuss what had occurred and knocked on her door "a little after 4 [p.m.]." When Selwyn did not respond, Sohriakoff claimed that he spoke with the other tenants a little longer and left Kamuela Housing at approximately 4:45 p.m.

---

[2/]    In its answering brief, the State asserts that no criminal charges were ever filed against Sohriakoff concerning the alleged sexual assault. However, there is no indication that evidence countering Selwyn's testimony was offered at trial.

The next day, November 3, 2005, Sohriakoff wrote up violation notices against Selwyn. On November 18 or 19, 2005, Sohriakoff sent Selwyn a "lease termination notice" which indicated HAP's intent to not renew Selwyn's lease on Jan 5 or 6, 2006. Sohriakoff insisted that the notice was not in any way retaliatory and was decided by the staff at HAP.

The testimony of three other residents of Kamuela Housing was presented. Pricilia Oana (**Oana**) lived across from Selwyn's building and could see the structure from her front door. In her testimony, Oana explained that she noticed Sohriakoff approach Selwyn's door on two separate occasions on November 2, 2005. On neither occasion did Oana see Sohriakoff enter into Selwyn's apartment. Oana also testified that she witnessed Sohriakoff leave Kamuela Housing some time between 4:30-6:30 p.m. Oana had previously told police that she witnessed Sohriakoff leave between 4:30-5:00 p.m. After Oana witnessed Sohriakoff leave, she stayed outside of her apartment until 6:30 p.m. and did not see anyone else approach Selwyn's apartment during that time.

Archie Kaaua (**Kaaua**) was also a resident at Kamuela Housing and could see Selwyn's apartment because it neighbored his. Kaaua testified that, on November 2, 2005, he saw Sohriakoff outside of Selwyn's apartment but did not see him enter at any time.

Finally, Alice Quanan (**Quanan**) was also a resident at Kamuela Housing during the date of the alleged assault. Quanan testified that she could "very clearly" see Selwyn's apartment from her own. Furthermore, Quanan saw Sohriakoff visit Selwyn's apartment a total of three times on November 2, 2005, with the first visit occurring sometime before 2:30 p.m. On no occasion did Quanan see Sohriakoff enter Selwyn's apartment. Quanan also testified that she "clearly" saw Sohriakoff leave Kamuela Housing

between 4:30-5:00 p.m., and she claimed she never left her front porch at any time between 4:30-8:00 p.m.

As noted above, in December of 2005, Selwyn sought and obtained a TRO against Sohriakoff. Soon after a hearing on the TRO, held on March 1, 2006, Sohriakoff's attorney, Christopher Roehrig (**Roehrig**), sent a letter on March 7, 2006, to the Chief of Police, Lawrence Mahuna (**Mahuna**), requesting that the police open an investigation of Selwyn for false reporting. Roehrig also contacted deputy prosecuting attorney Rick Damerville (**Damerville**) regarding Selwyn's prosecution for false reporting. After the police received Roehrig's letter, the focus of Officer Tamura's investigation changed from a sexual assault claim to a false reporting claim. Charges were brought against Selwyn and the case eventually proceeded to trial in March of 2009.

After the close of evidence at trial, during the State's closing argument, the prosecutor highlighted discrepancies between Selwyn's testimony and the other evidence presented at trial. In reference to Selwyn's email sent moments after the alleged assault, the prosecuting attorney said:

> Now do you remember what her response was when she was confronted with that email? First of all her response on examination by her lawyer, her response was, "Well sometimes I construct my emails early and then I send them out much later." The problem with that is it makes no sense. Because if you constructed early, then how can you say Mr. Chad Sohriakoff continued to knock on my door several more times until 5 p.m.? You couldn't construct it much earlier. Not – had to be after five. It's sent out 5:33. And between 5:00 and 5:15 she says she's being sexually assaulted.
>
> So putting the most that you can on it, you can say well maybe she constructed it at 5:00, she got sexually assaulted between 5 and 5:15, and then she decided to send out her ordinary day's routine email since she forgot to indicate that she's been sexually assaulted. Use your common sense. That's crazy. That is absolutely crazy.

In response to the prosecutor's closing argument, defense counsel argued that the reason Selwyn took so long to report the assault was because of her reaction to the deeply personal and traumatic nature of the assault. Also, in an

attempt to make Selwyn appear as the victim of a "witch hunt," the defense counsel also argued that Roehrig pressed the false complaint charge without Sohriakoff's consent.

Then, during the State's rebuttal argument, in reference to defense counsel's argument suggesting Roehrig initiated the false reporting claim against Selwyn without his client's authorization, the prosecuting attorney said:

> She makes some kind of deal about Chad Sohriakoff didn't want to follow through on this false report. He didn't tell Mr. Roehrig to do this. Well let me tell you something, the victim of false reporting is the police. It's the community. You pay every time the police go out and spend time and hours investigating false reports. The victim, the residual victim, the person who is harmed by the taint of the sex assault report that's Chad Sohriakoff. But the victim of this crime as instructed to you is the Police Department. That's the victim.

Defense counsel did not object to the prosecuting attorney's comments.

The jury found Selwyn guilty of the offense of False Reporting to Law Enforcement Authorities. Selwyn was sentenced to a term of probation of one year. The special terms and conditions of Selwyn's probation include 180 days in jail, 30 of which she must serve with the remaining under advisement. Selwyn filed a timely appeal on July 7, 2009. Selwyn's sentence was stayed pending appeal.

II. POINTS OF ERROR

Selwyn raises two points of error on appeal:

(1) The prosecutor's conduct during the closing arguments constituted misconduct and deprived Selwyn of her right to a fair trial. The first instance of alleged misconduct occurred when the prosecutor propounded his personal opinion as to the credibility of Selwyn's version of the events to the jury. The second instance of misconduct allegedly occurred when the prosecutor appealed to the emotions of the jurors by telling them that they, the police, and the community were the victims when the police had to investigate the false report.

8

(2) There was insufficient evidence to support Selwyn's conviction.

III. APPLICABLE STANDARDS OF REVIEW

Selwyn did not object to either of the alleged instances of prosecutorial misconduct in the proceeding below.

> If defense counsel does not object at trial to prosecutorial misconduct, this court may nevertheless recognize such misconduct if plainly erroneous. "We may recognize plain error when the error committed affects substantial rights of the defendant." State v. Cordeiro, 99 Hawai'i 390, 405, 56 P.3d 692, 707 (2002) (citations and internal quotation marks omitted). See also Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (2003) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

State v. Wakisaka, 102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003).

> The appellate court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." State v. Nichols, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006) (quoting State v. Sawyer, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998)). An appellate court's "power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." Nichols, 111 Hawai'i at 335, 141 P.3d at 982 (quoting State v. Kelekolio, 74 Haw. 479, 515, 849 P.2d 58, 74-75 (1993)).

State v. Suan, 121 Hawai'i 169, 174, 214 P.3d 1159, 1164 (App. 2009).

Accordingly, "[w]e will not overturn a defendant's conviction on the basis of plainly erroneous prosecutorial misconduct, however, unless 'there is a reasonable possibility that the misconduct complained of might have contributed to the conviction'" State v. Wakisaka, 102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003) (citation omitted). In other words, "[p]rosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a

fair trial." State v. Clark, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996) (internal quotation marks and citation omitted). "[W]henever a defendant alleges prosecutorial misconduct, this court must decide: (1) whether the conduct was improper; (2) if the conduct was improper, whether the misconduct was harmless beyond a reasonable doubt; and (3) if the misconduct was not harmless, whether the misconduct was so egregious as to bar reprosecution." State v. Maluia, 107 Hawai'i 20, 26, 108 P.3d 974, 980 (2005). In assessing whether prosecutorial misconduct rises to the level of reversible error, the Hawai'i Supreme Court has set forth three factors to consider: (1) the nature of the alleged misconduct; (2) the promptness or lack of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. Wakisaka, 102 Hawai'i at 515, 78 P.3d at 328 (citation omitted).

Regarding the sufficiency of the evidence:

We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

"Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion. And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence.

State v. Batson, 73 Haw. 236, 248-49, 831 P.2d 924, 931 (1992) (citations omitted).

IV.  DISCUSSION

A.  Prosecutorial Misconduct

Selwyn alleges that two instances of prosecutorial misconduct during the closing arguments deprived her of her right to a fair trial.  The first instance occurred when the prosecuting attorney referred to Selwyn's version of events as "crazy . . . absolutely crazy."  Selwyn argues that, with this remark, the prosecutor was advancing his personal opinion regarding Selwyn's credibility.

"It is generally recognized under Hawai'i case law that prosecutors are bound to refrain from expressing their personal views as to a defendant's guilt or the credibility of witnesses." Clark, 83 Hawai'i at 304, 926 P.2d at 209 (citations omitted). The rationale for this prohibition is that a prosecutor's "improper suggestions, insinuations, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."  Id. (footnote and citations omitted).

However, during closing argument, a prosecutor "is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence."  Id. (citations omitted).  "It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence. "  Id. (citations omitted).

In Clark, conflicting evidence regarding the defendant's drug use was presented to the jury.  During closing argument, the prosecutor stated "when the defendant comes in here and tells you that he was not on cocaine that night, that just – it's a cockamamie story and it's asking you to take yourselves as fools."  Clark, 83 Hawai'i at 304, 926 P.2d at 209 (emphasis added; brackets omitted).  The supreme court held that the remark was not improper based upon the evidence of the case and the

context in which the phrase was utilized. Id. at 306, 926 P.2d at 211. The court stated that "the prosecutor was within the limits of propriety to infer, and indeed argue, that [the defendant's] denial of drug usage was improbable, untruthful, and, in short, a 'cockamamie story.'" Id.

Here, the characterization of Selwyn's story as "crazy" is similar to the "cockamamie story" characterization in Clark. The remark was made in the context of the prosecutor's argument that Selwyn's testimony was not probable or believable. In this context, we conclude that this remark did not constitute misconduct. Cf. State v. Marsh, 68 Haw. 659, 660-61, 728 P.2d 1301, 1301-02 (1986) (prosecutor's statements of her personal belief that defendant lied, on at least nine occasions, including that she was "sure [the defendant] committed the crime," and that the defendant's testimony was "an out-and-out lie," "taken as a whole" arose to the level of plain error); Suan, 121 Hawai'i at 174, 214 P.3d at 1164 (prosecutor's statements that "these officers have integrity," "they could have come in here, no reports, told you anything, but they didn't," and "the purpose of the State today in this case is not to convict an innocent person" were improper).

The second instance of alleged misconduct occurred when the prosecutor argued to the jury, in rebuttal, that the victim of false reporting is the police, the community, and that "[y]ou pay every time the police go out and spend time and hours investigating false reports." As Selwyn points out, under Hawai'i law, prosecutors should not use arguments which are calculated to inflame the passions or prejudices of the jurors and must refrain from "injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." State v. Sanchez, 82 Hawai'i 517, 532-33, 923 P.2d 934, 949-50 (App. 1996) (emphasis omitted) (quoting 1 ABA Standards of Criminal

Justice (**ABA Standards**), The Prosecution Function, Standard 3-5.8, Argument to the jury (2d ed. 1986)).[3/]  That principle has been reiterated in a number of cases.

In State v. Apilando, 79 Hawai'i 128, 900 P.2d 135 (1995), the prosecutor asked the jury during closing argument to "send a message to the defendant that his actions were wrong, they're not to be tolerated by this community.  You have an authority to do that, ladies and gentlemen, and I'm asking you to find him guilty[.]"  Apilando, 79 Hawai'i at 142, 900 P.2d at 149.  The Hawai'i Supreme Court held that such remarks were improper and reasoned as follows:

> [W]e believe that such remarks could "divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under controlling law." . . . [W]e believe that there is significant risk that the jury might find the defendant guilty simply based on its view that the conduct the defendant is accused of committing is intolerable, even though it has not been proved beyond a reasonable doubt or otherwise fails to support a conviction of the charged offense.

Id. at 142-43, 900 P.2d at 149-50 (citations omitted).  Although the supreme court determined that the prosecutor's remarks were improper, it did not reach the question of whether the improper remark rose to the level of reversible error because the court vacated the defendant's conviction based on other grounds.  Apilando, 79 Hawai'i at 143, 900 P.2d at 150.

In Sanchez, the prosecutor remarked in closing argument that "[e]verybody in this County are [sic] victims" and that

_____

[3/]    ABA Standards, Standard 3-5.8, Argument to the jury:

      . . . .

      (c)  The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

      (d)  The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

"[w]e're all the victims" of the firearm violation for which the defendant was charged. <u>Sanchez</u>, 82 Hawaiʻi at 532-33, 923 P.2d at 949-50. This court concluded that such remarks were improper. <u>Id.</u> Like in <u>Apilando</u>, however, the court in <u>Sanchez</u> did not reach the question of whether the aforementioned remarks, alone, would require reversal. <u>Id.</u> at 534, 923 P.2d at 951.

More recently, in <u>State v. Suan</u>, 121 Hawaiʻi 169, 214 P.3d 1159 (App. 2009), this court determined that the prosecutor's statement in closing argument that "resources, time, and dollars of the taxpayers are spent to seek justice in this case for the victim" was improper. <u>Suan</u>, 121 Hawaiʻi at 176, 214 P.3d at 1166 (brackets omitted) (holding that the comment was "improper because it injected issues broader than Suan's guilt or innocence under the controlling law . . . and, in effect, diverted the jury from its duty to decide the case based on the evidence").

Here, the prosecutor's comments were much like those found to be improper in <u>Apilando</u>, <u>Sanchez</u>, and <u>Suan</u>. We similarly conclude that the prosecutor's remarks that "the victim of false reporting is the police[,]" "[i]t's the community[,]" and "[y]ou pay every time the police go out and spend time and hours investigating false reports" injected issues "broader than the guilt or innocence of the accused under the controlling law" into the case. <u>See</u> <u>Sanchez</u>, 82 Hawaiʻi at 533, 923 P.2d at 950. Also, the prosecutor should not have argued that "the victim of this crime as instructed to you is the Police Department."

"However, our finding that the prosecutor's comments were improper does not end the inquiry. Since defense counsel did not object below to the prosecutor's remarks, we must determine whether the prosecutor's misconduct constituted plain error which affected substantial rights of the defendant." <u>Marsh</u>, 68 Haw. at 661, 728 P.2d at 1302 (citing Hawaiʻi Rules of Penal Procedure (**HRPP**) Rule 52(b)). Neither <u>Apilando</u>, <u>Sanchez</u>,

or <u>Suan</u> reached the question of whether such comments, alone, required reversal of the defendant's conviction. <u>See</u> <u>Apilando</u>, 79 Hawaiʻi at 143, 900 P.2d at 150; <u>Sanchez</u>, 82 Hawaiʻi at 534, 923 P.2d at 951; <u>Suan</u>, 121 Hawaiʻi at 176, 214 P.3d at 1166. A conviction will not be overturned if the prosecutorial misconduct is harmless beyond a reasonable doubt. <u>Wakisaka</u>, 102 Hawaiʻi at 515, 78 P.3d at 328. We must determine whether the improper comments substantially prejudiced Selwyn's right to a fair trial, by considering: (1) the nature of the alleged misconduct; (2) the promptness or lack of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. <u>Id.</u>; <u>State v. Agrabante</u>, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992).

In this case, as we have discussed above, the prosecutor's remarks were improper. Although the prosecutor statements were made in rebuttal, purportedly in response to defense counsel's argument that Sohriakoff did not want to initiate a false reporting complaint, they strayed far afield from the issue of Selwyn's guilt or innocence under controlling law. Jurors could easily have personalized the comment that "*you pay*" when the police have to investigate false reports. (Emphasis added.) The purported victimization of the police and the community at large is clearly broader than the issue of Selwyn's guilt or innocence and creates a "significant risk that the jury might find the defendant guilty simply based on its view that the conduct the defendant is accused of committing is intolerable, even though it has not been proved beyond a reasonable doubt or otherwise fails to support a conviction of the charged offense." <u>Apilando</u>, 79 Hawaiʻi at 143, 900 P.2d at 150. As no objection was raised, no curative instruction was given. There were many pieces of evidence that undermined the believability of Selwyn's report of a sexual assault, including the neighbors' reports that they did not see Sohriakoff enter the apartment, Selwyn's email, the apparent delay in her reporting of the incident, and

15

Sohriakoff's testimony. However, the alleged assault purportedly happened behind closed doors, with no one present but Selwyn and Sohriakoff, and the assessment of their relative credibility was, perhaps, the paramount issue. We cannot conclude that the evidence against Selwyn was overwhelmingly strong or weak although, as discussed below, we conclude that it was sufficient to support Selwyn's conviction.

In reviewing these factors, we cannot conclude that the prosecutor's misconduct was harmless beyond a reasonable doubt. There is a reasonable possibility that the injection of the broader issues of who pays, and who is victimized, in cases of false reporting, may have contributed to the conviction. Accordingly, Selwyn's guilty verdict must be set aside. However, we do not conclude, in the broader context of the State's arguments and the albeit misguided attempts by the prosecutor to respond to an argument made by defense counsel, that the prosecution's misconduct was so egregious that a retrial should be barred. Cf. State v. Rogan, 91 Hawai'i 405, 984 P.2d 1231 (1999) (appeal to racial prejudice was egregious misconduct).

B.    Sufficiency of the Evidence

The trial court instructed the jury regarding HRS § 710-1015 as follows:

> There are two material elements of the offense of false reporting to a [sic] law enforcement authorities, each of which the prosecution must prove beyond a reasonable doubt. These two material elements are, one, on or about December 19, 2005, in the South Kohala District, County and State of Hawaii, the defendant, Sharon Louise Selwyn, intentionally made a report to law enforcement authorities relating to the crime of sexual assault; and, two, she knew that the information contained in the report was false.

Selwyn does not dispute the evidence supporting the first element, but alleges that because there was "substantial evidence that the sexual assault had in fact occurred,", there was no substantial evidence to prove the second element, i.e., that she "knew that the information in the report was false." Selwyn argues that the fact that "ample" evidence exists to support her

testimony proves that Sohriakoff sexually assaulted her.  And, because the sexual assault actually occurred, she lacked the culpable state of mind necessary to prove the second element of the offense of false reporting.

Selwyn's argument is without merit.  The record contains ample evidence from which the jury could infer that Selwyn was aware that the information contained in the report was false.  Selwyn's e-mail sent out at 5:33 p.m., moments after the alleged assault occurred, failed to mention the assault even though the purpose of the e-mail was to complain about Sohriakoff.  In his testimony, Sohriakoff expressly denied that the sexual assault occurred.  Several other tenants at Kamuela Housing testified seeing Sohriakoff leaving the complex before the time that Selwyn reported that the assault occurred.  There was testimony that Selwyn's report to police of the assault occurred forty-seven days after the alleged incident; although it appears that Selwyn called the rape crisis line five days after the alleged incident.  From the evidence adduced, it appears that a reasonable person could conclude that Selwyn knew that her report to the police was false.  As such, we conclude that the jury's verdict is supported by substantial evidence.

V.    CONCLUSION

For the foregoing reasons, we vacate the Circuit Court's June 23, 2009 Judgment of Conviction and Probation Sentence and remand for a new trial.

DATED:   Honolulu, Hawai'i, August 24, 2011.

On the briefs:

Jeffrey A. Hawk
(Hawk Sing Ignacio
  & Waters)
for Defendant-Appellant

Ricky R. Damerville
Deputy Prosecuting Attorney
County of Hawai'i
for Plaintiff-Appellee

Presiding Judge

Associate Judge

Associate Judge